

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00275-CV

———————————————

MODERN BUILDERS, LLC; ALICIA GONZALEZ; BETSY DARLING; CALLIE STEVENS; GRAYSON BUSTER; JAIME COBB TINSLEY; TOM TINSLEY; JESSE FOX; KELRAY LLC; URBAN LEGACY PROPERTIES, LLC, D/B/A URBAN LEGACY PROPERTIES SERIES A LLC; LAUREN A. BRADY; LAUREN BARRETT; LESA SUSI, TRUSTEE OF THE SUSI LIVING TRUST; LORI DUGDALE; M AND M POOL HOUSE LLC; MARTHA DOMINGUEZ; ADULFO DOMINGUEZ; SEAN SULLIVAN; SHANNON ROSS; SUSAN HARPER; SMITH-WALLACE PROPERTIES, LLC; THERESA RILEY, TRUSTEE OF THE TK RILEY FAMILY TRUST; TOM KRAUSE; TRACEY AMAYA; EDUARDO AMAYA; BROOKVALE HOLDINGS, LLC; AND LUCAS RUIZ, Appellants

V.

CITY OF FORT WORTH, Appellee

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-342969-23

---

Before Sudderth, C.J.; Kerr, J.; and Gonzalez, J.[1]
Opinion by Justice Kerr

[1]The Honorable Ruben Gonzalez, Judge of the 432nd District Court of Tarrant County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to Section 74.003(h) of the Government Code. *See* Tex. Gov't Code § 74.003(h).

# OPINION

## I.     Introduction

Following lengthy evaluation, the City of Fort Worth decided in 2018 that short-term rentals (STRs) are best confined to certain areas of the city, where they are now expressly allowed, and in 2023, those lawful STRs became subject to registration requirements.[2] The appellants (Owners) own properties in single-family residential districts where STRs are not—and never were—explicitly allowed under the City's zoning scheme.

Raising constitutional and other challenges to their inability to lawfully use their properties as STRs, the Owners warn darkly of an "Orwellian surveillance apparatus" deploying "neighborhood informants, police interrogations, and monitoring by city employees" that is wholly at odds with "Cowtown, Where the West Begins." Despite this asserted dystopian hellscape, this case boils down to land uses versus police powers.

For the reasons that follow, we hold that the Owners have no vested right to lease their properties short-term; that the City's two STR Ordinances rationally relate to legitimate government interests in preserving the character of single-family residential neighborhoods; that those Owners who were operating STRs before the 2018 Ordinance was adopted had no settled and reasonable expectations that they could so use their properties; and that the Owners' ultra vires claim is not proper against the

---

[2]We refer to the 2018 and 2023 ordinances collectively as the "STR Ordinances."

City. We additionally hold that the trial court did not reversibly err by admitting the testimony of the City's expert and that its award of attorney's fees to the City was not an abuse of discretion.

## II.   Background

### A. How the City historically viewed residential rentals of less than thirty days.

As Dana Burghdoff—the City's Zoning Administrator between 2007 and 2019 and after that the Assistant City Manager—explained, since "at least 2007" the City "consistently" determined that "STRs were prohibited in single-family residential districts (and other residentially[ ]zoned districts)."[3] When residents or property owners asked, they would be told of this prohibition.

The City based its determination on existing provisions within its comprehensive zoning ordinance. In particular, as part of its Chapter 9 "Definitions" section, the zoning ordinance defined "bed and breakfast home" as an owner–operator's homestead or primary one-family residence providing overnight accommodation to transient

---

[3]In one case, the City sued several residential-property owners who had been leasing their properties on a short-term basis and obtained an agreed order in 2008 that permanently enjoined the owners from having "more than one lessee per dwelling unit during any thirty (30) day period." The record suggests that this was the situation mentioned in the summary-judgment affidavit of the City's Deputy Code Compliance Director, who recounted that "prior to the passage of the 2018 Ordinance, Code Compliance staff shut down homes in the Arlington Heights neighborhood for hosting 'transient or short term' guests during rodeo season." The street addresses of the properties covered by the 2008 agreed order place the majority of them within Fort Worth's Arlington Heights neighborhood, which is close to the traditional venue for the annual Fort Worth Stock Show & Rodeo.

guests and defined "transient or short[-]term resident" as an individual who occupies or rents a home or room for less than 30 days.[4] According to Burghdoff, because bed and breakfasts were not a permitted use in single-family residential districts per the "Residential District Use Table"—Section 4.603 of the City's zoning ordinance and part of its Chapter 4 "District Regulations"—neither were their analogs, STRs.

## B. As online STR-booking platforms took off, the City took a closer look.

Beginning around a decade ago, such websites as VRBO and Airbnb became wildly popular ways to book STRs.[5] That popularity drove an influx of inquiries to the City about whether STRs were allowed in residential districts—and a corresponding increase in complaints from City residents about STRs and their guests, including complaints about noise disturbances, loud parties, trash, and parking or traffic congestion.

The City thus began a process in 2016 to research how other cities were dealing with STRs and to clarify in the zoning ordinance those districts within which STRs were or were not allowed. A November 2016 City Manager report noted that "[c]urrent regulations"—presumably referring to those covering bed and breakfast homes—

---

[4]At all relevant times, bed and breakfast homes have been a permitted use—by special exception from the City's Board of Adjustment—in two-family residential districts under the comprehensive zoning ordinance.

[5]In her 2024 deposition, one Owner agreed that, since 2016, platforms like Airbnb have become "much more prevalent" and have "entered into the popular zeitgeist," noting that "'Airbnb' is a verb now."

"prohibit[ed] the rental of residential property" for less than 30 days in single-family residential districts, and the report outlined a plan to communicate that fact to neighborhoods. A little over a year later, another report proposed adding the use "transient or short-term rental"—already a defined term, as noted—to the use tables "to clarify that the use is not allowed in residential districts outside of bed and breakfast homes or inns, and is allowed in mixed-use, commercial, and industrial districts as a commercial use."

## C. The City's review yielded an amended zoning ordinance in 2018.

The preamble to the adopted Ordinance No. 23110-02-2018 (the 2018 Ordinance) noted that "short[-]term home rentals (homes rented for less than 30 consecutive days) are not specifically defined, expressly permitted[,] or listed in any of the zoning use categories provided in the use tables for residential, non-residential[,] or form-based districts"; that in determining whether a property is being used as an STR, "if the duration of the stay is less than 30 days, that use is not allowed since it is more analogous to a bed or breakfast home[,] which is allowed in a two-family zoning district by special exception but is prohibited in one-family zoning districts"; and that the Zoning Ordinance was being amended to "affirm" that STRs are prohibited in one- and two-family zoning districts by adding a definition for short-term home rental and by including that newly defined use in the land-use tables "to clarify that a short[-]term home rental is not allowed in residential districts but is allowed in other districts as a commercial use." Burghdoff's summary-judgment affidavit explained that STR use, as

6

"commercial," "is inherently incompatible with a residentially[ ]zoned neighborhood where there exists a sense of community and camaraderie (or, at least, familiarity) between neighbors. STR guests, by definition, do not stay in a neighborhood or community to build and maintain those relationships."

The 2018 Ordinance defined a "Short[-]Term Home Rental"—which we have shortened to STR—this way:

> The rental for compensation of dwellings or accessory dwelling units for the purpose of overnight lodging for a period of not less than one night and not more than 30 consecutive days other than ongoing month-to-month tenancy granted to the same renter for the same unit as their primary residence. . . .

The residential-use table was correspondingly amended to add "Short[-]Term Home Rental" to the "Other" category of uses, with an empty cell in the use table underneath all the types of residential zoning districts to visibly signal that STRs were not allowed there (but were an allowed use in non-residential areas).[6]

According to Burghdoff, the deliberative process surrounding the 2018 Ordinance generated little in the way of public comment.

**D. The City delved further into the STR issue between 2019 and 2022.**

Although the 2020 COVID pandemic rekindled the debate over STRs, with the City's being asked to consider allowing STRs in residentially zoned districts and

---

[6] *See* Fort Worth, Tex., Code of Ordinances, app. A, ch. 4, art. 6, § 4.601(d) ("*Uses not allowed.* An empty cell [in a table designation] indicates that a use is not allowed in the respective zoning district.").

receiving more outcry in opposition, the City's Development Services Department had already begun, in 2019, to investigate more closely whether STRs could have any place in residential districts. Over a roughly three-year period, the City—

- researched other cities' STR ordinances;

- contacted other cities to ask about their STR-regulating experiences;

- consulted organizations in the field of city planning and zoning about STR regulations;

- reviewed scholarly articles about STRs' negative impacts on residential neighborhoods;

- analyzed how the City could ensure that legally operating STRs were paying the City's Hotel Occupancy Tax; and

- tracked and compiled STR complaints and violations within the City.

The City received several presentations and reports concerning STRs and possible regulations between September 2019 and March 2022, after which it opened up the STR issue for public debate.

**E. Further research and public input solicited during 2022 led to the 2023 Ordinance.**

During multiple meetings in 2022, the City Council heard public comment both for and against STRs in residential neighborhoods. The City also set up a publicly accessible webpage to house STR-related information and created surveys and questionnaires so that all interested constituencies could share their thoughts and concerns. Additionally, the City engaged a data-mining company to collect details about existing STR activity in Fort Worth; that company reported its findings in August 2022.

The upshot of the City's multiyear investigation and community engagement was (1) feedback from full-time residents and neighborhood associations that, in Burghdoff's words, "overwhelmingly" supported continuing to ban STRs by right in residential districts and (2) consensus that lawful STRs should be subject to a registration ordinance.

So in February 2023, the City Council adopted Ordinance No. 26005-02-2023 (the 2023 Ordinance). The 2023 Ordinance did not change the 2018 Ordinance's prohibition of STRs in residential districts but added regulations covering those STRs that could lawfully operate in the City's commercial and mixed-use districts.[7] An owner in a residential district who wants to rent out property for less than 30 days can apply for a zoning change.[8]

Among the City's findings underpinning the 2023 Ordinance was that regulating STRs in the areas where they were allowed was "necessary for the health, safety[,] and welfare of the general public, the promotion of consistent land uses and development, and the protection of landowners and residents of" the City. Recognizing the importance of "support[ing] tourism in a balanced way," the City Council "determined

---

[7]Those regulations include ones requiring registration with and approval by the City so that the City can pinpoint STR locations, ensure that all taxes are being paid, and have contact information for STR owners and agents for any complaints and emergencies.

[8]The City has approved at least one such requested change by rezoning a duplex and two adjacent single-family dwellings from residential to low-intensity mixed use.

that enacting a registration program for STRs will serve to balance the rights of all stakeholders through a fair and balanced regulatory framework and ensure that the STRs do not become a nuisance."

## F. This litigation

In June 2023, more than one hundred[9] Owners sued for declaratory and permanent injunctive relief[10] against the City over the STR Ordinances, alleging (1) unconstitutional deprivation of property rights, *see* Tex. Const. art. I, § 19; (2) unconstitutionally retroactive deprivation of settled property rights, *see* Tex. Const. art. I, § 16;[11] (3) arbitrary discrimination that violates equal protection, *see* Tex. Const. art. I, § 3; and (4) ultra vires acts exceeding the City's authority under the Zoning Enabling Act, Tex. Loc. Gov't Code §§ 211.001–.058.

---

[9]Not all of them are parties to this appeal.

[10]The Owners did not seek interim injunctive relief to halt enforcement of the City's Ordinances while the case was pending.

[11]Twenty-one of the original plaintiffs had purchased their properties before 2018; seven are among the appellants, and we will refer to these seven as Retroactivity Owners for purposes of the Article I, Section 16 claim.

10

After both sides moved for traditional summary judgment, the trial court entered a final judgment in the City's favor and awarded attorney's fees to it.[12] This appeal followed.

## III.  Issues on Appeal

The Owners raise these issues:

- Whether the trial court erred in dismissing, on summary judgment, the Owners' constitutional and ultra vires claims;

- Whether the trial court erred in considering the City's expert's affidavit; and

- Whether the trial court erred in awarding attorney's fees to the City.

## IV.  Constitutional Claims[13]

### A.  Standard of review and applicable law

We first address the Owners' claims involving the Texas Constitution: due course of law, retroactivity, and equal protection. *See* Tex. Const. art. I, §§ 3, 16, 19. Although we examine the entire record in considering such claims, *see Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 87 (Tex. 2015), our review of these legal matters—as with our review of summary judgments generally, *see Travelers Ins. v. Joachim*, 315 S.W.3d 860,

---

[12]Before taking up the attorney's-fee issue, the trial court first granted the summary-judgment motion on unspecified grounds, a ruling that was subsumed within its final judgment.

[13]In this section we address the first three subparts of the Owners' first issue. Their fourth subpart, a nonconstitutional ultra vires claim, involves different considerations that we address separately.

862 (Tex. 2010)[14]—is de novo. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 932 (Tex. 1998) (noting that "ultimate question" of zoning ordinance's constitutionality is question of law, not fact).

A duly enacted statute or ordinance enjoys a "strong presumption" of constitutional validity. *State v. Loe*, 692 S.W.3d 215, 227 (Tex. 2024); *see Patel*, 469 S.W.3d at 87; *City of Brookside Village v. Comeau*, 633 S.W.2d 790, 792–93 (Tex. 1982). A party challenging an ordinance's constitutionality shoulders "an extraordinary burden to show that no conclusive or even controversial or issuable fact or condition existed which would authorize the municipality's passage of the ordinance." *Comeau*, 633 at 792–93 (citation modified).

A century ago, the United States Supreme Court established a municipality's right to enact zoning ordinances, using language that seems prescient in today's fast-changing world of the internet and online STR-booking platforms:

> [P]roblems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or

---

[14]And as always, we consider summary-judgment evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

> even half a century ago, probably would have been rejected as arbitrary and oppressive.

*Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386–87, 47 S. Ct. 114, 118 (1926). Accordingly, "no fixed constraints may be placed on the police power for the future." *Maher v. City of New Orleans*, 516 F.2d 1051, 1059 (5th Cir. 1975). Rounding up then-current United States Supreme Court authority, the *Maher* court noted the "ample and protean" boundaries of police power and a legislature's "rich and flexible" power to "essay new solutions to new problems." *Id.* Although the Fifth Federal Circuit's comments came half a century ago, and hot on the heels of another high-court zoning decision,[15] they apply with equal force today.

Texas recognizes that "[z]oning ordinances and land-use ordinances are valid exercises of a city's police power to safeguard the health, comfort, and general welfare of its citizens." *City of Dickinson v. Crystal Cruise Invs., LLC*, No. 01-24-00684-CV, 2026 WL 530391, at *5 (Tex. App.—Houston [1st Dist.] Feb. 26, 2026, no pet. h.); *see* Tex. Loc. Gov't Code § 211.001 (reiterating bases for municipal zoning authority). As we have explained, zoning ordinances evince "legitimate governmental interests" when they relate to "(1) safeguarding the life, health, safety, welfare, and property of STR occupants, neighborhoods, and the general public and (2) minimizing the adverse

---

[15] *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S. Ct. 1536, 1541 (1974) (noting that a city's police power is "not confined to elimination of filth, stench, and unhealthy places" but is "ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people").

impacts resulting from increased transient rental uses in neighborhoods that were planned, approved, and constructed for single-family residences." *Draper v. City of Arlington*, 629 S.W.3d 777, 786 (Tex. App.—Fort Worth 2021, pet. denied); *see Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 328 (5th Cir. 2022) (recognizing "legitimate local purposes" of "preventing nuisances, promoting affordable housing, and protecting neighborhoods' residential character").

With those principles in mind, we turn to the STR Owners' constitutional complaints.

## B. Due-course-of-law claim

The Texas Constitution provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges[,] or immunities . . . except by the due course of the law of the land." Tex. Const. art. I, § 19. To date, the Texas Supreme Court has found no meaningful distinction between federal due-process and state due-course-of-law guarantees. *E.g., Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 15 (Tex. 2015) (citing *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)); *see also Patel*, 469 S.W.3d at 86 (noting typical—but not mirror-image—federal–state alignment in this area).[16]

---

[16]*But see City of Grapevine v. Muns*, 671 S.W.3d 675, 677 (Tex. 2023) (Young, J., concurring in denial of petition for review) (explaining that waiting for "better vehicle" to address STR bans' constitutionality could "allow advocates and scholars to more fully develop the original—and perhaps distinct—meaning[ ]" of the Texas due-course-of-law clause).

14

In reviewing due-course claims, we must determine (1) whether a plaintiff has a property interest that warrants constitutional protection and (2) only if so, "whether the defendant followed due course of law in depriving the plaintiff of that interest," *Loe*, 692 S.W.3d at 227–28, or—put differently—"what process is due," *Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 653 n.16 (Tex. 2022) (quoting *Mosley v. Tex. Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019)). Under *Patel*, a plaintiff who has a constitutionally protected property interest must show that either (1) the challenged ordinance's purpose "could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the [ordinance's] actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest."[17] 469 S.W.3d at 87.

### 1. The STR Owners have no vested right to lease short term.

"[T]o rise to the level of a due[-]process [or due-course] deprivation, [a plaintiff] must first possess a vested property right." *Rancho De Los Arboles LLC v. Town of Cross Roads*, No. 02-25-00208-CV, 2026 WL 253459, at *6 (Tex. App.—Fort Worth Jan. 30, 2026, no pet.) (first citing *Klumb*, 458 S.W.3d at 17; and then citing *City of Grapevine v. Muns*, 651 S.W.3d 317, 345 (Tex. App.—Fort Worth 2021, pet. denied) (op. on reh'g)).

---

[17]Although the City argues that the "so burdensome" test is limited to economic-regulation statutes, we assume without deciding that *Patel*'s second prong could apply to the situation here but do not reach it. *See* n.21, *infra*.

A vested right must have "some definitive, rather than merely potential existence" and be "something more than a mere expectancy based upon an anticipated continuance of an existing law." *Id.* (first quoting *City of LaMarque v. Braskey*, 216 S.W.3d 861, 864 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); and then quoting *Klumb*, 458 S.W.3d at 15). And a "bare contention that the right to use property as an STR is inherently vested is unsupported . . . in the law." *Id.* at *6 n.13.

Property rights are not "absolute," *Crown Distrib.*, 647 S.W.3d at 654, and "[l]imitations on property rights may be by . . . appropriate government action under its police power." *Severance v. Patterson*, 370 S.W.3d 705, 710 (Tex. 2012). No "constitutionally protected vested right" exists to "use real property in any certain way, without restriction." *Braskey*, 216 S.W.3d at 863 (citing *City of Univ. Park v. Benners*, 485 S.W.2d 773, 778 (Tex. 1972)); *see Zaatari v. City of Austin*, 615 S.W.3d 172, 191 (Tex. App.—Austin 2019, pet. denied) (noting that right to lease for profit can be subject to restriction under certain circumstances); *Consumer Serv. All. of Tex., Inc. v. City of Dallas*, 433 S.W.3d 796, 805 (Tex. App.—Dallas 2014, no pet.) ("Property owners do not have a constitutionally protected, vested right to use property in any certain way.").

In *Rancho De Los Arboles*—our most recent foray into the STR issue—we remanded Rancho's due-course claim for repleading because neither side had provided the version of Cross Roads' ordinance in effect when Rancho acquired the property it had been using as an STR for many years before receiving Cross Roads' notice that STRs were prohibited in single-family residential areas. 2026 WL 253459, at *1, *6–7.

16

For that reason, "Rancho ha[d] not demonstrated that it had a vested property right to use the property as an STR when it acquired the property and ha[d] not met its pleading burden for this cause of action." *Id.* at *7.

A few years before *Rancho De Los Arboles*, in *Grapevine*, we concluded on interlocutory appeal that the STR owners there had a general vested right to lease as part of their "bundle of rights" that was sufficient to support a viable due-course claim challenging Grapevine's outright ban on STRs anywhere within the city. 651 S.W.3d at 347. But we circumscribed that conclusion: "[w]hether the durational restrictions imposed by the STR Ordinance violate[d] the Homeowners' due-course-of-law rights regarding their right to lease [went] to the case's merits, an altogether improper inquiry at [that] stage of the case." *Id.* That is, we did *not* hold that what we viewed as a general right to lease necessarily or even likely encompassed a vested right to lease on a short-term basis; we did nothing more than permit the owners' due-course claim to proceed to a merits disposition in the trial court. *Id.* In so doing, we were agnostic about its eventual fate.

Reading *Rancho De Los Arboles* and *Grapevine* together—and together with other persuasive authority—suggests that a right to lease short-term, if it is to be called "vested," can be properly informed by whether that right was enshrined under a

17

preexisting ordinance.[18] *See, e.g., Crystal Cruise*, 2026 WL 530391, at \*6 (holding that because city's vacation-rental ordinance had been in place for six years before STR owner bought the property, the owner "[could not] show that it has any vested right to use the property as a vacation rental as a matter of law."); *see also Marfil v. City of New Braunfels*, No. 6:20-CV-00248, 2021 WL 8082644, at \*5 (W.D. Tex. July 29, 2021) (agreeing that "the right to lease property for short durations is objectively out of place on" list of traditionally protected interests as collected in *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)), *report and recommendation adopted*, 2022 WL 18034356 (W.D. Tex. Sept. 15, 2022), *vacated and remanded*, 70 F.4th 893 (5th Cir. 2023); *cf. Zaatari*, 615 S.W.3d at 191 (noting city's acknowledgement that under earlier ordinances allowing STRs, "Austinites ha[d] long exercised their right to lease their property" as STRs, which were "an 'established practice' and a 'historically . . . allowable use'"); *Village of Tiki Island v. Ronquille*, 463 S.W.3d 562, 587 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (recognizing narrow vested right in particular use of property when new law restricts an existing use).

Perhaps, then, a better way to look at the intersection of STRs and municipal regulation is to view STRs as conditionally allowed uses rather than as having the sort of "definitive, rather than merely potential existence," *Rancho De Los Arboles*,

---

[18]In *Grapevine*, we held that STRs had been allowed under the city's preexisting ordinance but that, under *Benners*, the owners did not thereby possess a vested right to lease short-term. 651 S.W.3d at 346.

2026 WL 253459, at *6, that exalts them automatically to vested status. Certainly, as online STR platforms have proliferated, more and more municipalities have responded with various types of ordinances: banning them altogether (e.g., *Grapevine*); banning them but grandfathering in those who had previously used their properties as STRs (e.g., *Marfil v. City of New Braunfels*, No. 6:20-CV-00248, 2025 WL 243028, at *2 (W.D. Tex. Jan. 10, 2025) (order on remand), *appeal docketed*, No. 25-50025 (5th Cir. Jan. 17, 2025)); banning them without a special-use permit (e.g., *Crystal Cruise*); creating STR zones and requiring operating permits (e.g., *Draper*); and other approaches.[19] To us, these evolving governmental responses are of a piece with the United States Supreme Court's recognition, in *Village of Euclid*, that problems are "constantly" developing that "require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities." 272 U.S. at 386–87, 47 S. Ct. at 118.

We are not insensitive to Lockean notions of and respect for private-property rights, but communities have important interests, too, under which municipalities may "essay new solutions to new problems." *Maher*, 516 F.2d at 1059. We recognized as much in *Draper* by labeling "legitimate" those governmental interests in "(1) safeguarding the life, health, safety, welfare, and property of STR occupants,

---

[19]We express no opinion about the constitutional validity of any ordinances other than those at issue in this appeal.

neighborhoods, and the general public" and—equally important—"(2) minimizing the adverse impacts resulting from increased transient rental uses in neighborhoods that were planned, approved, and constructed for single-family residences." 629 S.W.3d at 786.

Answering the question left open in *Grapevine*, then, we hold that the Owners do not have a vested common-law right to use their properties as short-term rentals.[20] This

[20]This conclusion is bolstered by the Texas Supreme Court's post-*Grapevine* decisions in *Crown Distributing* and *Loe*, both of which—unlike *Patel*—focused on the critical threshold issue of carefully and narrowly defining the asserted interest. *Crown Distrib.*, 647 S.W.3d at 653 & n.16 (declining to reach step two because due-course clause did not protect hemp companies' asserted interest in manufacturing and processing smokable hemp products as part of liberty right to "work and earn a living" and noting that *Patel* did not engage step one because parties had assumed a protected interest and focused only on second step); *Loe*, 692 S.W.3d at 231–33 (noting that because "parental control and authority have never been understood as constitutionally mandated absolutes," "novel treatments for a novel condition [gender dysphoria] are generally within the Legislature's power to regulate without facing heightened scrutiny," so although challenged statute "limit[ed] the availability of novel medical treatments for children diagnosed with a novel medical condition, it [did] not deprive those children's parents of any constitutionally protected right or undermine a custom embedded in our history or traditions").

In defining the interest at stake here, and narrowing it as we should, we thus distinguish between a right to lease and a right to lease for less than 30 days; the former is a core incident of property ownership, the latter a specific use carrying no common-law categorical vested-right protection. *See Crystal Cruise*, 2026 WL 530391, at *5–6 (holding no vested right to use property as STR). Although in contending that "STRs have long been an unexceptional residential use of property in Texas" the Owners point us to several old cases, *e.g.*, *Coalson v. Holmes*, 240 S.W. 896 (Tex. 1922); *Williams v. State*, 47 S.W.2d 298 (Tex. Crim. App. 1932), those cases merely mentioned weekly rentals, and such references were incidental to the legal analysis. But STRs in their current iteration are possible only because of the internet, driving both a qualitative and quantitative leap from boarding-houses of yore and, it is fair to say, exponentially accelerating occupant turnover—not to mention incentivizing a property owner to use

20

holding is enough to affirm judgment on the Owners' due-course claim, but because rational-basis review applies to the Owners' equal-protection claim, we will explain here why the STR Ordinances satisfy that test for due-course purposes as well.[21]

### 2. The STR Ordinances have a rational basis.

Under highly deferential rational-basis review,[22] we uphold ordinances if a city reasonably believes—if it is "at least fairly debatable"—that they promote a legitimate governmental objective. *See Mayhew*, 964 S.W.2d at 938. An ordinance violates due process if it "has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety[,] or the public welfare in its proper sense." *Draper*, 629 S.W.3d at 786 (quoting *Mayhew*, 964 S.W.2d at 938). Our concern is not "whether the ordinance

---

his property as an STR rather than lease it out for a longer term. Even the Owners, in their petition, asserted that "[s]hort-term renting is, on a per-diem basis, more lucrative than longer-term rentals." *Cf. Hogan v. S. Methodist Univ.*, 688 S.W.3d 852, 854–55, 863 (Tex. 2024) (noting that COVID-era statute "created new rules governing novel litigation in the wake of a novel and previously unimaginable event").

[21]We decline to reach *Patel*'s undue-burden prong, an analysis that is made unnecessary by our holding that the Owners do not have a vested right to engage in short-term renting.

[22]The rational-basis test is "the most deferential of the standards of review that courts use in due-process and equal-protection analysis." *Rational-basis test*, Black's Law Dictionary (12th ed. 2024). We note that, in *Zaatari*, our sister court in Austin struck down STR regulations not under rational-basis review but under a heightened standard of review against the city. 615 S.W.3d at 199–202. Here, both sides agree that rational basis is the appropriate framework.

was effective; we ask only if the City could rationally have believed at the time of enactment that the ordinance would promote its objective." *Id.* Framed in the negative, "[w]e will not set aside an ordinance unless it is clearly arbitrary and unreasonable." *Id.* (citing *Mayhew*, 964 S.W.2d at 938).

The scope of what qualifies as a legitimate governmental objective embraces police powers that include not just protecting health, safety, and morals but extend to such broad concepts as "public welfare," *Mayhew*, 964 S.W.2d at 938, and "quality of life," *City of San Antonio v. TPLP Off. Park Props.*, 218 S.W.3d 60, 65–66 (Tex. 2007) (holding that city's legitimate interest in separating commercial traffic from residential neighborhood by closing private business's driveway access to public street both for safety and to improve residents' "quality of life" passed rational-basis review). And precisely because "[t]he concept of the public welfare has a broad range," an ordinance must stand if reasonable minds could differ on whether it promotes such welfare. *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 805 (Tex. 1984).

When it comes to STR regulations in particular, one court has noted that it could "clearly understand"—as can we—"how short-term renters could affect the residential character within neighborhoods, specifically those which are zoned for single[-] or dual[-]family living." *Marfil*, 2025 WL 243028, at *1 (granting summary judgment for city and finding that "there exists a rational basis for this ordinance *at least* for the preservation of residential character" and referring, among other things, to "numerous statements from affected residents" expressing desire to preserve residential character).

We ourselves have said as much: the "residential character of a neighborhood is threatened when a significant number of homes . . . are occupied not by permanent residents but by a stream of tenants staying a weekend, a week, or even 29 days" whether or not STRs have other, unmitigable "adverse impacts." *Draper*, 629 S.W.3d at 792 n.21 (quoting *Ewing v. City of Carmel-By-The-Sea*, 286 Cal. Rptr. 382, 388 (Cal. Ct. App. 1991)).

Here, the Owners contend that the City's characterization of STRs as "commercial" in the 2018 Ordinance is "inherently irrational" and contrary to controlling authority that—according to the Owners—recognizes that short-term renters do the same sorts of "residential" things that both long-term renters and permanent residents do and that receiving rental income does not transform a residential use into a commercial one.[23] They also argue that "zoning-type regulations must be based on harm"—an iffy proposition under rational-basis review—and that the record does not show that harm occurs more often in STRs purely because of the renters' length of stay.

---

[23]The Owners principally rely on cases involving restrictive covenants stating that all properties were to be used solely for residential purposes. *E.g.*, *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 291 (Tex. 2018). "But a restrictive covenant is not the same concept as a zoning regulation." *Villanueva v. Village of Volente*, No. 1:23-CV-1246, 2024 WL 2143596, at *11 (W.D. Tex. May 13, 2024) (denying STR owners' motion to preliminarily enjoin ordinance), *appeal dism'd*, No. 24-50396, 2024 WL 4815039 (5th Cir. June 13, 2024).

But the Owners do not refute the City's other legitimate reason for the STR Ordinances: preserving neighborhood character, which differs from addressing either real or theoretical harms such as noise, traffic, and the like. They posit that neighborhood character is already preserved by the simple fact that their properties are and have been zoned residential and are used for that purpose, asserting that "[b]anning a residential use to preserve 'residential character' is a contradiction in terms, not a rational basis for a sweeping ban on STRs." Even assuming that leasing a residence for profit is inherently "residential," as the Owners assert, we aren't convinced that what comes down to limiting a subset of an activity contradicts preserving the broader character of that activity. For example: although driving is allowed in residential areas, that activity can be limited by imposing lower speed limits, bans on large trucks, etc., to preserve residential character. This is not a "contradiction" just because "driving" is a permitted activity. Rather, it is the intensity and nature of the use that matters—constant high-speed or commercial traffic changes a residential neighborhood's character in much the same way that frequent guest turnover, minimal community ties, and unfamiliar faces do when it comes to STRs. *Cf. TPLP Off. Park Props.*, 218 S.W.3d at 65–66. Moreover, several Owners themselves agreed that "reasonable persons can differ in their opinions" on STRs and the extent to which they should be allowed in residential districts.

24

Mayberry might be fictional,[24] but a city's interest in fostering and preserving residential communities where "people are invested and engaged in their neighborhood and care about each other," *see Slice of Life, LLC v. Hamilton Twp. Zoning Hearing Bd.*, 207 A.3d 886, 900 (Pa. 2019), is real—and rational, and legitimate. *Cf. Lombardo v. City of Dallas*, 73 S.W.2d 475, 482–83 (Tex. 1934) (quoting *Miller v. Bd. of Pub. Works*, 234 P. 381, 387 (Cal. 1925), in observing that with ownership of single-family residences come "stability, the welding together of family ties, and better attention to the rearing of children"; "increased interest in the promotion of public agencies, such as church and school, which have for their purpose a desired development of the moral and mental make-up of the citizenry of the country"; and "recognition of the individual's responsibility for his share in the safeguarding of the welfare of the community and increased pride in personal achievement which must come from personal participation in projects looking toward community betterment"); Robert D. Putnam, *Bowling Alone: The Collapse and Revival of American Community* 307 (20th anniv. ed. 2020) ("Neighborhoods with high levels of social capital[25] tend to be good places to raise

---

[24]*See* The Andy Griffith Show (CBS 1960–68); *The Andy Griffith Show*, IMDB, https://www.imdb.com/title/tt0053479/ (last accessed May 27, 2026).

[25]Putnam defines "social capital" as "connections among individuals—social networks and the norms of reciprocity and trustworthiness that arise from them." Putnam, *supra*, at 19.

25

children. In high-social-capital areas, public spaces are cleaner, people are friendlier, and the streets are safer.").

That such a goal is not easily quantified—or even, in today's atomized society, that this goal is perhaps unlikely to (re)gain purchase—does not make it any less rational. Indeed, under rational-basis review, "courtroom fact-finding" is not the standard, and a city's legislative judgments "may be based on rational speculation unsupported by evidence or empirical data."[26] *Klumb*, 458 S.W.3d at 13 (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 2102 (1993)).

In short, the STR Ordinances rationally address a legitimate governmental interest.

---

[26]Of course, as we detailed above in Part II.B–E, the City did in fact amass quite a lot of information from its multiyear investigation, including soliciting citizen input and considering other cities' STR experiences. *See City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 51–52, 106 S. Ct. 925, 931 (1986) (holding that city could rely on other cities' experiences in enacting zoning ordinance; city need not "conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant" to the particular problem); *Villanueva*, 2024 WL 2143596, at *8 (noting that Village's STR ordinance "was passed only after the Village's careful consideration of other municipalities' experiences with STRs and hearing the concerns of many Village residents" over many years); *Draper*, 629 S.W.3d at 788 (declining to reverse denial of preliminary injunction against STR ordinance that derived from "public comment and input" even though no "data set" substantiated city's claim that excluding STRs allowed neighborhoods to maintain quiet and repose). Fort Worth's leaders did not wake up one morning and decide on a whim to adopt the STR Ordinances.

## C. The Retroactivity Owners'[27] claim

The Texas Constitution provides that "[n]o bill of attainder, ex post facto law, retroactive law, or any other law impairing the obligation of contracts shall be made." Tex. Const. art. I, § 16. "A retroactive law is one that extends to matters that occurred in the past." *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014); *see Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002) (defining a retroactive law as "a law that acts on things which are past"). But not all retroactive laws are unconstitutional. *See Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 139 (Tex. 2010) ("Mere retroactivity is not sufficient to invalidate a statute." (quoting *Tex. Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648 (Tex. 1971))).

Three considerations inform a retroactivity challenge: (1) the nature and strength of the public interest the legislation serves; (2) the nature of the prior right that is impaired; and (3) the extent of the impairment. *Id.* at 145. To satisfy the second prong, a plaintiff must show that he has a settled and reasonable expectation of the constitutional right asserted. *Id.* at 148; *see Zaatari*, 615 S.W.3d at 190. We "first consider the nature of the rights claimed and the statute's impact on them," and only if a party's "settled expectations" are disturbed do we consider "whether the statute serves a public interest." *Fire Prot. Serv., Inc. v. Survitec Survival Prods., Inc.*, 649 S.W.3d 197, 201 (Tex. 2022) (noting that "a law is not retroactive in the constitutional sense unless it disrupts

---

[27]*See supra* n.11.

27

or impairs settled expectations"); *see Hogan*, 688 S.W.3d at 854–55, 863 (concluding that COVID-era statute protecting schools from monetary liability for altering their activities in response to the pandemic did not retroactively withdraw student's right to seek contract damages from university for breaking promise of in-person education; no "settled rules" existed governing ability to recover damages when government forced university to go online, and statute "created new rules governing novel litigation in the wake of a novel and previously unimaginable event").

Here, then, the Retroactivity Owners must show that they had a reasonable and settled expectation that they could operate their single-family residential properties as STRs when the City passed the 2018 Ordinance. They argue that they have carried this burden and that "[t]his case is just like *Zaatari*," in which the Austin court invalidated that city's amended STR ordinance as unconstitutionally retroactive. But critical differences exist.

Most important, Austin had—by ordinance—expressly allowed STRs since 2012 if property owners satisfied certain eligibility criteria and obtained a license. *Zaatari*, 615 S.W.3d at 180. Many people invested heavily in properties in reliance on that ordinance. *Id.* at 191. But in 2016, the city amended its regulations to suspend the licensing of any new STRs in single-family residences that were not owner-occupied or associated with an owner-occupied principal residential unit ("type-2" STRs) and to eliminate type-2 STRs altogether by 2022. *Id.* at 181. The State intervened in the

28

property owners' lawsuit to assert that this aspect of the 2016 ordinance was unconstitutionally retroactive. *Id.*

Our sister court first held that because the city had not shown that its purported public-interest issues were unique to type-2 STRs—as opposed to homestead-designated STRs also in residential areas—the ordinance did not advance a compelling interest. *Id.* at 189–90 ("Nothing in the record before us suggests that the City's reasons for banning type-2 rentals address concerns that are particular to type-2 rentals or that the ban itself would actually resolve any purported concerns."). It then held that the type-2 STR owners had a "settled interest" in their right to lease short term because, as the city acknowledged, "Austinites have long exercised their right to lease their property by housing short-term tenants"; "short-term rentals are an 'established practice' and a 'historically . . . allowable use"; and property owners "who rented their individual properties as type-2 short-term rentals before" the city eliminated that type of rental "did so after investing significant time and money into the property for that purpose." *Id.* at 191.

On those facts, Austin's ordinance was held to have unconstitutionally taken away settled expectations—a holding that is not terribly surprising. But Fort Worth's pre-2018 posture on STRs was quite different. No ordinance allowed them at all.

29

Further, the Retroactivity Owners variously admitted that, before 2018, they had not researched whether STRs were allowed;[28] did not know whether STRs were or were not allowed in the City; or, at a minimum, understood that whether they could lease their properties short-term was an "unsettled" issue. One Retroactivity Owner, who bought his several STR properties between 2021 and early 2024, testified that he knew in 2021 that the issue was "unsettled" and that he bought his properties "with that understanding. It is an unsettled issue. It is in debate. It is, hopefully, going to get worked out."

From this record, especially when contrasted with *Zaatari*, the Retroactivity Owners lacked any reasonable—much less settled—expectation that they could lease their residential properties short-term.

---

[28]One Retroactivity Owner did submit an unsworn declaration stating that, in 2017, she "reached out to the City's planning and zoning department to inquire about whether leasing of a guest house was permissible" and "learned that . . . short-term renting was allowed," a conversation she relied on to build a guest house on her property. But any such "statements or assurances regarding zoning" made by a city official "are not binding." *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 678 n.89 (Tex. 2004) (quoting *City of Pharr v. Pena*, 853 S.W.2d 56, 62 (Tex. App.— Corpus Christi–Edinburg 1993, writ denied), and similar cases). And this Owner testified in deposition that she could not recall whether she was told that STRs were allowed in residential districts or that no ordinance specifically banned them. She also testified that up until the 2023 Ordinance, the issue of whether STRs would be allowed in the City was unsettled, although she now understands that they were "not expressly allowed" before 2018, a difference she did not understand at the time and so "thought [they were] fully allowed."

## D. Equal-protection claim

To state a viable equal-protection claim under the Texas Constitution, *see* Tex. Const. art. I, § 3, a plaintiff must show that he was "treated differently from others similarly situated." *Klumb*, 458 S.W.3d at 13. And when "neither a suspect classification nor a fundamental right is involved," the plaintiff "must further demonstrate that the challenged decision is not rationally related to a legitimate governmental purpose." *Id.* Equal-protection challenges are analyzed the same way under both the federal and Texas Constitutions. *See Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 266 (Tex. 2002). The United States Supreme Court instructs that "[a] classification does not fail rational-basis review because . . . in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Heller v. Doe*, 509 U.S. 312, 321, 113 S. Ct. 2637, 2643 (1993) (cleaned up).

For the same reasons we concluded above that (a) the Owners do not have a vested right to short-term leasing and (b) the STR Ordinances rationally relate to a legitimate governmental purpose, we hold that the Owners do not have a viable equal-protection claim.[29] The trial court did not err by granting summary judgment on this claim.

---

[29]We need not reach the City's argument that STR owners are not a "class" at all and therefore that the Owners failed to even state an equal-protection claim.

\* \* \*

We affirm summary judgment on the Owners' three constitutional claims.

## V. Ultra Vires Claim

The Owners argue that even if the STR Ordinances are constitutional, the City acted ultra vires when it enacted them, exceeding its authority under the Zoning Enabling Act, Tex. Loc. Gov't Code §§ 211.001–.058. In the trial court, the City raised governmental immunity as an affirmative defense and, in its summary-judgment motion, asserted that it was "debatable" whether the court had jurisdiction, citing *Patel*, 469 S.W.3d at 76 ("[S]uits complaining of ultra vires actions may not be brought against a governmental unit, but must be brought against the allegedly responsible government actor in his official capacity.").[30]

As we recently reiterated in *Rancho De Los Arbores*, a claim of ultra vires action is proper only against the appropriate government official, not the entity; "[t]he governmental entities themselves remain immune from suit because unlawful, ultra

[30]Although the City did not, in its appellate briefing, mention its earlier jurisdictional uncertainty, we can raise jurisdictional issues on our own. *See*, *e.g.*, *In re J.J.R.S.*, 627 S.W.3d 211, 225 n.15 (Tex. 2021) ("Courts may raise jurisdictional issues sua sponte for the first time on appeal."); *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) ("[A]ll courts bear the affirmative obligation to ascertain that subject matter jurisdiction exists regardless of whether the parties have questioned it." (cleaned up)); *McDaniel v. Crowley Indep. Sch. Dist.*, No. 02-24-00053-CV, 2025 WL 876777, at \*5 (Tex. App.—Fort Worth Mar. 20, 2025, pet. denied) ("Sovereign and governmental immunity sufficiently implicate subject matter jurisdiction such that it cannot be waived by failure to assert it in the trial court and can be raised for the first time on appeal, even if the appellate court raises it sua sponte.").

vires acts of officials are not acts of the State." 2026 WL 253459, at *7. We held that because "Rancho's live pleading alleges a substantive ultra vires claim [for exceeding its authority under the Zoning Enabling Act] against the municipality itself . . . —rather than against any specified official—Rancho has failed to plead a justiciable ultra vires claim." *Id.* *8; *see Tex. Dep't of Ins. v. Reconveyance Servs., Inc.*, 306 S.W.3d 256, 258–59 (Tex. 2010) (concluding that when a plaintiff's claims are substantively ultra vires claims, they must properly be brought against the appropriate government official in his official capacity rather than the entity). Rancho's ultra vires declaratory claim was thus "incurably deficient and deprived the trial court of jurisdiction." *Rancho De Los Arbores*, 2026 WL 253459, at *8.

Having considered the Owners' ultra vires claim as pleaded and briefed to us, we conclude that jurisdiction is lacking. As in *Rancho De Los Arbores*, the Owners' "live pleading alleges a substantive ultra vires claim [for the City's exceeding its authority under the Zoning Enabling Act] against the municipality itself" and not "against any specified official." *Id.* We thus dismiss the Owners' claim that the City exceeded its authority under the Zoning Enabling Act and do not address its merits.

## VI.    Admission of the City's Expert Testimony

The Owners complain that the trial court abused its discretion by "impliedly" denying their motion to exclude the summary-judgment affidavit of the City's expert, Dr. Peter Tarlow, a sociologist with expertise on tourism and, in his words, "the effects

of transient populations on local communities."[31] But the Owners give no explanation of the affidavit's alleged harm.

The Owners objected to Dr. Tarlow's expert affidavit, arguing that his opinions were irrelevant and unreliable and that he was not qualified as an expert witness. They continue that challenge on appeal.

As for relevance, the Owners take issue with the City's using Dr. Tarlow's affidavit in its summary-judgment motion to "corroborate[] Burghdoff's view of STRs," arguing that due to the City's "limited" use of the affidavit, "the most Tarlow's testimony was intended to do was echo a city official's 'view' that the City adopted the Ordinances to preserve and protect residential neighborhoods from alleged harms and commercial uses while also 'supporting tourism.'" The Owners attack the reliability of Dr. Tarlow's opinions because, they say, his expertise was unrelated to anything specific to STRs or the City and because he admitted that he has no expertise on residential rentals.

But even if the Owners are right, they must show more. We "cannot reverse a trial court's judgment based on the erroneous admission of evidence unless the error

---

[31]Among his opinions were that the "proliferation of STRs in residential neighborhoods . . . degrades the balance between transient visitors and residents and is incompatible with the characteristics of a community," and that "the transitory nature of STRs is inherently incompatible with residential neighborhoods." He concluded that because of these differences between "a resident (wherever a city may draw the line) and a non-resident transient visitor," it is "reasonable and rational to treat a short-term renter different[ly] than a long-term and/or permanent resident."

34

'probably caused the rendition of an improper judgment.'" *Jackson v. Takara*, 675 S.W.3d 1, 6 (Tex. 2023) (quoting Tex. R. App. P. 44.1(a)(1)). And it is the complaining party who must "demonstrate that the judgment turns on the particular evidence admitted." *Id.* (quoting *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004)). In addition, "[c]learly, erroneous admission is harmless if it is merely cumulative," *Nissan Motor*, 145 S.W.3d at 144, and the Owners themselves characterized Dr. Tarlow's affidavit as cumulative of Burghdoff's.[32]

Here, the Owners have neither argued nor shown that Dr. Tarlow's affidavit drove the resulting judgment in ways large or small.[33] They have thus not satisfied Rule 44.1(a)(1)'s standard for reversible error. *See* Tex. R. App. P. 44.1(a)(1). We overrule the Owners' appellate complaint about Dr. Tarlow's testimony.

---

[32]Dr. Tarlow's opinions track those of Burghdoff, who holds degrees in city planning from the Massachusetts Institute of Technology and has many years' experience in the City's Planning and Development Department, including as Zoning Administrator. In her summary-judgment affidavit, Burghdoff averred that STR use "is inherently incompatible with a residentially[ ]zoned neighborhood where there exists a sense of community and camaraderie (or, at least, familiarity) between neighbors. STR guests, by definition, do not stay in a neighborhood or community to build and maintain those relationships." Burghdoff also made the self-evident point that "if a dwelling in a single-family residentially[ ]zoned neighborhood is being used for STRs, it is not available on the market for a long-term or permanent resident."

[33]The Owners attempted to address harm in their reply brief, but we are not persuaded. Moreover, we have our doubts about whether the City even needed to submit an expert affidavit, given a municipality's wide latitude in its police-power regulations and the deference given to its rational choices.

## VII.   Attorney's Fees

In their final issue, the Owners contend that the trial court erred in awarding attorney's fees to the City under the Texas Uniform Declaratory Judgments Act (UDJA), *see* Tex. Civ. Prac. & Rem. Code § 37.009, which provides that a court "may award . . . reasonable and necessary attorney's fees as are equitable and just" in "any" Chapter 37 proceeding. "The reasonable and necessary requirements are questions of fact to be determined by the factfinder,[34] but the equitable and just requirements are questions of law for the trial court to decide." *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 161 (Tex. 2004) (citing *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)). A defendant that requests attorney's fees in answering a declaratory-judgment suit—as the City did here—may be entitled to fees as the prevailing party. *Cadle Co. v. Harvey*, 46 S.W.3d 282, 289 (Tex. App.—Fort Worth 2001, pet. denied).

The Owners argue that courts do not award attorney's fees to the government in constitutional cases unless the claims are frivolous or brought in bad faith, relying on cases dealing with other statutory bases for such awards—none of which involved the UDJA. *See Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*, 434 U.S. 412, 421, 98 S. Ct. 694, 700 (1978) (holding that prevailing defendant in Title VII case could recover fees only if plaintiff's claim was "frivolous, unreasonable, or groundless,"

---

[34]The Owners do not challenge the amount or necessity of the City's attorney's fees.

36

referencing 42 U.S.C. § 2000e-5(k)); *Vaughan v. Lewisville Indep. Sch. Dist.*, 62 F.4th 199, 207 (5th Cir. 2023) (addressing attorney's fees authorized under the Voting Rights Act, 28 U.S.C. § 1927); *Rickert v. Meade*, No. 06-20-00002-CV, 2020 WL 4354946, at *3 (Tex. App.—Texarkana July 30, 2020, no pet.) (addressing fees under Civil Rights Act, 42 U.S.C. § 1983); *Ubiñas-Brache v. Dall. Cnty. Med. Soc'y*, 261 S.W.3d 800, 802–03 (Tex. App.—Dallas 2008, pet. denied) (addressing fees under Texas Medical Practice Act, Tex. Occ. Code § 160.008(c), and federal Health Care Quality Improvement Act, 42 U.S.C. § 11113). The Owners contend that unless the claims are patently baseless, "[c]ourts are reluctant to award attorney's fees against plaintiffs undertaking to enforce their constitutional rights." *Stenseth v. Greater Ft. Worth & Tarrant Cnty. Cmty. Action Agency*, 673 F.2d 842, 848 (5th Cir. 1982).[35]

But under the UDJA, a trial court's touchstone is whether a fee award would be "equitable and just." Tex. Civ. Prac. & Rem. Code § 37.009. Although these are questions of law, *see Ridge Oil Co.*, 148 S.W.3d at 161, "[m]atters of equity are addressed to the trial court's discretion," *Bocquet*, 972 S.W.2d at 21. And Texas courts have affirmed awards of attorney's fees in favor of the government in declaratory-judgment suits, most notably in *Save Our Springs Alliance, Inc. v. Lazy Nine Municipal Utility District. ex rel. Board of Directors*, 198 S.W.3d 300 (Tex. App.—Texarkana 2006, pet. denied).

---

[35]*Stenseth* involved an unsuccessful Section 1983 claim, with the Fifth Circuit holding that the district court had abused its discretion in finding that the plaintiff had pursued a frivolous claim when its futility was revealed only in hindsight. *Id.*

There, the nonprofit organization that had sought declaratory relief argued on appeal that the trial court's award of attorney's fees to an arm of the local government was not equitable and just.[36] *Id.* at 318–19. The court of appeals disagreed, noting the trial court's discretionary power and concluding that "[b]ecause reasonable minds can differ concerning whether the attorney's fees are just and equitable, we cannot say the trial court abused its discretion in awarding such fees to" the local-government arm. *Id.* at 319. We cannot say that here, either, just as we could not say that the trial court had abused its discretion if it had declined to award attorney's fees to the City. We overrule the Owners' final issue.

## VIII. Conclusion

Having overruled each of the Owners' issues, we vacate the trial court's judgment on the ultra vires claim and dismiss that claim for lack of jurisdiction, and we affirm the remainder of the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: May 28, 2026

---

[36]The nonprofit had challenged the constitutionality of the legislative bill that created the municipal utility district at issue. *Save Our Springs All., Inc.*, 198 S.W.3d at 308.